Filed 2/14/14  P. v. Miramontes CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H036887 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. 211361) |
| v. | |
| RUDOLFO MIRAMONTES et al., | |
| Defendants and Appellants. | |

### STATEMENT OF THE CASE

After an investigation regarding the activities of the Nuestra Familia gang in Santa Clara County, the Santa Clara County District Attorney filed a 43-count indictment charging 20 defendants with conspiracy to sell methamphetamine, active gang participation, and other gang-related crimes. Of the 20 defendants charged in the indictment, only defendant Rudolfo Miramontes and defendant Michael Ortiz proceeded to trial.

The indictment charged Miramontes with active gang participation (Pen. Code, § 186.22, subd. (a)), conspiracy to sell methamphetamine (Pen. Code, §182, subd. (a)(1); Health & Saf. Code, § 11379, subd. (a)), assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)), and extortion (Pen. Code, §§ 518-520). The indictment alleged that the conspiracy, the assault, and the extortion were committed for the benefit of, at the direction of, and in association with a criminal street gang (Pen. Code, § 186.22,

subds. (b)(1)(A), (b)(1)(B), (b)(4)(C)). The indictment also alleged that Miramontes had three prior strike convictions (Pen. Code, §§ 667, subds. (b)-(i), 1170.12), served three prior prison commitments (Pen. Code, § 667.5, subd. (b)), and had two prior serious felony convictions (Pen. Code, § 667, subd. (a)).

The indictment charged Ortiz with active gang participation (Pen. Code, § 186.22, subd. (a)) and conspiracy to sell methamphetamine (Pen. Code, § 182, subd. (a)(1); Health & Saf. Code, § 11379, subd. (a)). The indictment alleged that Ortiz participated in the conspiracy for the benefit of, at the direction of, and in association with a criminal street gang (Pen. Code, § 186.22, subd. (b)(1)(A)). The indictment also alleged that Ortiz had a prior strike conviction (Pen. Code, §§ 667, subds. (b)-(i), 1170.12) and a prior serious felony conviction (Pen. Code, § 667, subd. (a)).

Miramontes and Ortiz were jointly tried by the same jury. The jury convicted on all counts and found all of the gang allegations to be true. The trial court found all of the prior strike allegations, prior prison commitment allegations, and prior serious felony allegations to be true.

The court sentenced Miramontes to a prison term of 149 years to life, as follows: 35 years to life for the active gang participation conviction, 39 years to life for the conspiracy conviction, 40 years to life for the assault with a deadly weapon conviction, and 35 years to life for the extortion conviction. The court sentenced Ortiz to a prison term of 14 years, as follows: six years for the conspiracy conviction, three years for the gang enhancement, five years for the prior serious felony conviction, and a concurrent six-year term for the active gang participation conviction.

On appeal, Miramontes makes the following arguments: 1) his trial counsel rendered ineffective assistance in failing to object to irrelevant, prejudicial, and cumulative evidence; 2) the prosecution presented insufficient evidence to support his conspiracy conviction; 3) the prosecution presented insufficient evidence to corroborate the hearsay statements of coconspirators; 4) the trial court erred in failing to sua sponte

2

instruct the jury that hearsay statements of coconspirators required corroboration; 5) the trial court erred in failing to sua sponte instruct on an uncharged conspiracy; 6) the trial court erred in admitting recorded jail phone calls pursuant to Evidence Code section 1223; 7) the trial court erred in failing to exclude portions of the jail phone calls pursuant to Evidence Code section 352; and 8) cumulative error warrants reversal.

Ortiz makes the following arguments on appeal: 1) the trial court erred in refusing to sever his case from Miramontes's case, and the resulting joint trial violated his right to due process; 2) the trial court erred in admitting a letter that was inadmissible hearsay; 3) the trial court erred in failing to grant immunity to two prosecution witnesses and in failing to compel the prosecutor to grant immunity to those witnesses; 4) cumulative error warrants reversal; 5) the sentence on the active gang participation conviction must be stayed pursuant to Penal Code section 654; and 6) his restitution fine and corresponding parole revocation restitution fine must be reduced because the trial court misapplied Penal Code section 1202.4, subdivision (b)(2). Miramontes joins Ortiz's arguments regarding immunity and staying pursuant to Penal Code section 654.

As set forth below, we conclude that the trial court erred in failing to stay the sentences on the active gang participation convictions pursuant to Penal Code section 654. We also conclude that the trial court erred in considering Ortiz's active gang participation conviction in calculating Ortiz's restitution fine under Penal Code section 1202.4, subdivision (b)(2). We accordingly will stay the sentence on Miramontes's active gang participation conviction, stay the sentence on Ortiz's active gang participation conviction, and reduce Ortiz's restitution fine and corresponding parole revocation restitution fine. Finding no further errors, we will affirm the judgment in all other respects.[1]

---

[1] Miramontes has also filed two petitions for writ of habeas corpus, which this court ordered considered with the appeal. By separate orders of this date, we deny the petitions for writ of habeas corpus.

STATEMENT OF THE FACTS

*The Structure of the Nuestra Familia*

From August 2000 to January 2009, Campbell Police Sergeant Dan Livingston, a member of the Santa Clara County Specialized Enforcement Team (SCCSET), investigated Nuestra Familia (NF) activities in Santa Clara County. Sergeant Livingston testified as a gang expert and as a narcotics expert. John Mendoza, who was an NF member from 1994 to September 2007, also testified as a gang expert.

Sergeant Livingston explained that the NF is a Hispanic gang that formed inside the California prison system during the 1960's. NF members are from Northern California, and they identify with the color red and the number 14. Sergeant Livingston opined that the primary activities of the NF are drug sales, extortions, robberies, assaults with deadly weapons, murders, and kidnappings. The NF carries out crimes in prison and on the streets.

NF members make a lifetime commitment to the organization. Sergeant Livingston explained that NF members are "willing to go to prison for the rest of their life for the organization." NF members who fail to fulfill their duties may be killed at the direction of the organization.

Sergeant Livingston testified that the NF has a "very detailed constitution" and a hierarchical structure that is similar to the structure of the military. At the top of the NF hierarchy are three generals, who are imprisoned at Pelican Bay State Prison.[2] One of those generals, Antonio Guillen, oversees the NF's street activities and activities in the county jails. Category three NF members, who are equivalent to captains in the military, rank just below the generals. Ten years of membership in the NF is required to be a

---

[2] In the late 1990's, the then-current NF generals were moved to a federal prison, and an internal struggle regarding control of the NF ensued. Sergeant Livingston explained that currently there are new generals that reside at Pelican Bay State Prison.

category three member. Below the category three members are category two members, experienced NF members with a rank equivalent to lieutenants in the military. Category one NF members rank just below the category two members.

The Nuestra Raza (NR) is a subsidiary of the NF, and NF members have authority over NR members. NR members are required to follow the "Fourteen Bonds," a set of rules created by the NF. In order to join the NR, a potential NR member must be sponsored by an NF member. This procedure ensures that the NF maintains control over the NR. Although NR members make a lifetime to commitment to follow NF directives while they are incarcerated, their participation in NF street activities is optional.

Mendoza explained that "Northerners" are subordinate to NF members and NR members. Northerners are incarcerated people or Hispanic street gang members who choose to follow NF directives. Northerners participate in NF street activities and NF activities inside jails and prisons. Sergeant Livingston testified that Northerners "look up to" NF members and NR members.

Sergeant Livingston explained that the NF uses coded communications in order to hide its criminal activities from the police. NF and NR members write to each other in the Nahuatl language, an Aztec dialect that is difficult to understand and decode. Male NF and NR members refer to each other by female names in order to confuse the police. The NF also utilizes "three-way" phone calls. In a three-way call, an incarcerated NF or NR member calls a recipient who connects the call to a third party, thereby preventing the police from ascertaining the identity and phone number of the third party.

Individuals who have been deemed no good by the NF or who have "crossed the organization" are placed on the NF's "bad news list," known as the "BNL." The BNL is a hit list. Sergeant Livingston explained that individuals on the BNL may be stabbed, shot, sliced, or killed at the direction of the NF. Mendoza testified that incarcerated individuals who are on the BNL are subject to "removal." A removal is an NF-sanctioned process by which one person stabs or slices the targeted individual with a

5

knife, two other people beat the targeted individual, and the stabber then disposes of the knife.

### The NF Conspiracy to Sell Methamphetamine

Sergeant Livingston testified that the "primary concern" of the NF is to send money into the prisons, where the majority of the NF membership is incarcerated. He explained that the "NF makes most of its money from drug sales." NF "street regiments" facilitate NF drug sales. Sergeant Livingston testified that the sale of methamphetamine is a primary activity of every NF street regiment. Mendoza confirmed that all NF street regiments are involved in methamphetamine sales.

Sergeant Livingston explained that every street regiment has "a regiment commander who is in charge of the regiment." A "second in command" distributes drugs to regiment members and associates, who sell the drugs. Mendoza explained that regiment members are "usually" NF or NR members. He further explained that it is common for Northerners to be associates of NF street regiments and to sell NF-supplied drugs.

Sergeant Livingston testified that it is "very common" for the NF to "front" drugs to those who sell NF drugs. The term "fronting drugs" means that the seller takes the drugs and pays for them at a later time. Mendoza explained that a regiment commander will front drugs to his sellers because it eliminates the possibility that the police will catch the regiment commander with a large supply of drugs. Mendoza testified that sellers who have been fronted drugs are required to pay back the regiment commander. The obligation to pay back the regiment commander exists even when the seller has been arrested and the drugs have been confiscated by the police. Sellers who fail to pay for drugs are placed on the BNL.

Mendoza testified that it is the practice of the NF to inform Northerners who sell NF drugs that the NF is supplying the drugs. He explained that this procedure is part of the process of informing Northerners that they must pay the NF for drugs.

6

Street regiment members and associates who sell NF drugs are required to pay their regimental commander dues of $200 per month. Mendoza explained that the dues are sent to NF members in prison.

Between 2002 and 2008, NF members Lorenzo Guzman, Charlie Campa, James Cramer, Sammy Ramirez, and Mendoza commanded street regiments in Santa Clara County. Police officers searched homes belonging to these regiment commanders and numerous homes belonging to regiment members. The searches uncovered many items related to NF methamphetamine sales, including methamphetamine, digital scales, plastic baggies, pay/owe sheets, cash, firearms, and Aztec translation sheets. At trial, Sergeant Livingston testified at length regarding the evidence seized during the searches.

Mendoza explained that his regiment sold up to 30 pounds of methamphetamine per month. He collected $1,500 profit for each pound sold. He was required to give 25 percent of the profits to the NF.

### Ortiz's Participation in the NF Methamphetamine Conspiracy

Sergeant Livingston testified that Ortiz is a member of the Varrio 12th Street gang. Ortiz's moniker is "Raton."

Vince Tirri, an NR member from 2001 to 2010, testified that he sold methamphetamine for Campa's NF regiment in 2002 and 2003. In 2003, Tirri gave Ortiz NF methamphetamine to sell. Tirri informed Ortiz that the methamphetamine was supplied by the NF. Tirri testified that Ortiz sold methamphetamine for the Campa regiment for "a couple months." Tirri explained that Ortiz assisted the Campa regiment's sale of drugs in additional ways, including storing drugs, dropping off drugs, and serving as a driver.

In 2004, Tirri worked for Mendoza's NF regiment. NR member Isaac Marquez also worked for Mendoza's regiment at that time. Marquez told Tirri that he had supplied Ortiz with NF methamphetamine to sell.

7

Tirri worked for Ramirez's NF regiment in 2005 and 2006. Marquez worked for Ramirez's regiment at that time, and Marquez supplied Ortiz with NF drugs to sell. In 2006, Ortiz became a "functioning member" of the Ramirez regiment. As a member of the regiment, Ortiz paid monthly dues.

Patrick Martinez, who was an NR member from 2003 to 2007, also worked for the Ramirez regiment in 2005. Martinez testified that Marquez fronted Ortiz NF methamphetamine to sell. At one point, Ortiz was late in paying for methamphetamine. Martinez went to Ortiz's house to collect the money, and Ortiz stated that he was unable to sell the methamphetamine he had been fronted. Martinez asked Ortiz, "You know where that money's going?" Ortiz responded, "Yes." Ortiz looked scared, and he promised to pay the debt in a couple of days.

Ramirez testified regarding the operation of his regiment. He explained that Tirri recruited people to sell NF drugs, and that Marquez fronted NF drugs to sellers. When he was running his regiment, Ramirez did not know Ortiz, and he was unaware that Ortiz was selling drugs for his regiment. Ramirez explained that he did not know all of the people who were functioning in his regiment, and that he isolated himself from his regiment members in order to avoid detection by law enforcement.

On July 19, 2006, SCCSET Agent Edward Whitfield conducted surveillance outside a house on Bird Avenue in San Jose. Officer Whitfield saw two different cars approach the house and stop for a short period of time. Ortiz approached the passenger side of each car, and Officer Whitfield saw Ortiz "do an exchange" through the open passenger window of each car. Officer Whitfield believed the exchanges were narcotics transactions. Officer Whitfield later searched the house, and he found 11 grams of methamphetamine, two digital scales, and mail bearing Ortiz's name.

Police officers searched Marquez's home on June 20, 2007. They found methamphetamine, scales, and a list of nicknames and phone numbers. Sergeant Livingston testified that some of the people included on the list were associated with the

8

NF, and he explained that the list's reference to "Rat" was a reference to Ortiz. In the search of Marquez's house, police also found a letter postmarked January 19, 2005 and bearing Marquez's return address in jail. In the letter, Marquez directed his wife to put "pressure" on "Raton." The letter also stated, "Don't be happy with a little payment." Sergeant Livingston opined that Marquez was using the letter to instruct his wife on collecting a drug debt from Ortiz.

On May 29, 2008, San Jose Police Officer Anthony Vizzusi conducted surveillance outside a house on Singleton drive. He saw three different cars drive into the house's driveway. Each time a car pulled up, Ortiz exited the house, approached the car, and had a short interaction with the driver. During Ortiz's interaction with the third car, Officer Vizzusi saw that Ortiz and the driver "exchanged something." Officers later searched the house, and they seized several letters and a cell phone. Sergeant Livingston opined that text messages on the cell phone showed that Ortiz sold narcotics. Sergeant Livingston also opined that the letters seized in the search showed Ortiz's involvement with gang activity and narcotics sales. One of the letters, which was postmarked April 18, 2007, and bore Ortiz's return address in jail, instructed Ortiz's girlfriend on the prices various individuals would pay for methamphetamine. In another letter, which was signed by "Raton," the author described his "jail program" and his "responsibility" inside jail. Sergeant Livingston opined that this letter showed that Ortiz was functioning under the NF in jail.

Sergeant Livingston opined that Ortiz was an associate of the NF. His opinion was based on the fact that several NR members identified Ortiz as an associate of the NF, Ortiz's classification as a Northerner in the county jail, and a tattoo on Ortiz's knee. Sergeant Livingston also opined that, assuming the prosecution proved Ortiz's involvement in a conspiracy to sell methamphetamine, Ortiz's participation in the conspiracy was done for the benefit of, at the direction of, and in association with the NF. He explained that proceeds of the conspiracy supported NF members in prison, that NF

9

members directed the methamphetamine sales, and that NF members and associates worked together to sell the methamphetamine.

*Miramontes's Participation in the NF Methamphetamine Conspiracy*

Sergeant Livingston and Mendoza explained that Miramontes is a category one NF member. NF and NR members refer to Miramontes as "Dancing Bear" or "DB."

In 2006, Mendoza and Miramontes were in custody at the Santa Clara County Jail. Mendoza explained that Miramontes was the NF's "regimental commander" of the jail, and that Miramontes "took control of the jail." Miramontes ordered that methamphetamine smuggled into the jail by anyone associated with the NF was to be given to NF leadership at the jail.

Cramer was also in custody at the Santa Clara County Jail in 2006. Mendoza heard Cramer ask Miramontes questions regarding the management of the Cramer regiment. Cramer asked Miramontes "how to manage his manpower, how to manage the money, how to establish a bank." Miramontes told Mendoza that "Cramer was messing up out there," and Miramontes stated his intention "to take control of Cramer's regiment." Mendoza testified that Miramontes "basically asserted control over [Cramer's] regiment." Miramontes told Mendoza that he was involved in collecting money owed to the Cramer regiment.

Sergeant Livingston opined that Miramontes took over Cramer's regiment. He also testified that NF general Guillen directed Miramontes to "get the county in order."

Mendoza confirmed that he was "aware" that Miramontes ran an NF street regiment while in custody at the Santa Clara County Jail, and that Miramontes continued to run the regiment when released from jail in 2007. He also testified that Guillen had given Miramontes authority over all the street regiments in Santa Clara County.

Sergeant Livingston searched Miramontes's home on September 13, 2007. Sergeant Livingston found an Aztec-English translation sheet, and he explained that it

10

was the code NF members use to communicate. He also found contact information for an incarcerated NF member.

Sergeant Livingston opined that, assuming the prosecution proved Miramontes's involvement in a conspiracy to sell methamphetamine, Miramontes's participation in the conspiracy was done for the benefit of, at the direction of, and in association with the NF. He explained that the proceeds of the conspiracy supported NF members in prison, that NF members directed the methamphetamine sales, and that NF members and associates worked together to sell the methamphetamine.

***The Extortion of Eric Burns***

NR member Eric Burns was in custody at the Santa Clara County Jail in early 2007. Miramontes and Mendoza were still incarcerated at the jail at that time. Miramontes told Mendoza that Burns owed Cramer money. Miramontes stated that he had assumed collection of the debt, and that he had given Burns a timeframe to pay the debt. Miramontes further stated that Burns would be "hit" if he failed to pay within the timeframe.

Frank Gutierrez, an NR member from 2004 to early 2010, was also in custody at the jail in early 2007. Gutierrez testified regarding a conversation he had with Burns. Burns stated that he was "getting pressed" to pay a drug debt he owed to Cramer. Burns said that he was given a deadline to pay the debt, and that he "needed to get that money fast." Burns appeared to be "upset" and "concerned." Gutierrez explained that there was talk that Burns could be placed on the BNL if he failed to pay, and that Burns could be assaulted or killed if placed on the BNL.

Cramer was still in custody at the jail in early 2007. Gutierrez testified regarding a conversation he had with Cramer. Cramer told Gutierrez that money had to be collected from Burns in order to pay off a debt owed by Paul Rios, a member of Cramer's NF regiment. Cramer explained that Rios owed the NF money because he had disrespected Miramontes. Cramer left the jail at some point in February 2007, and he directed

11

Gutierrez to ensure that Rios's debt was paid through money orders. Gutierrez testified that he discussed the debt with Alysia Silva, an NF associate who assisted the Cramer regiment. Gutierrez explained that Silva was supposed to send out three money orders totaling $800, and that Silva was supposed to send copies of the money orders to Miramontes. Miramontes later informed Gutierrez that he had received the copies of the money orders.

Three money orders were entered into evidence. One of the money orders was worth $200, was payable to Guillen, and was deposited in Guillen's prison account on February 8, 2007. The second money order was worth $240, was payable to category 3 NF member Victor Esquibel, and was deposited in Esquibel's prison account on February 26, 2007. The third money order was payable to Miramontes and was processed on February 5, 2007. The money order payable to Guillen listed the purchaser's name as Alysia Silva and listed her address as 343 Angel Avenue in Sunnyvale. The two other money orders listed the purchaser's address as 343 Angel Avenue in Sunnyvale.

In addition to the foregoing evidence regarding the extortion, the prosecution introduced 35 recorded jail phone calls. In a January 27, 2007 call from Burns to his mother, Burns stated that he owed a $750 drug debt, and he told his mother to pay $450 to Silva. In a January 30, 2007 call, Cramer told NR member Ronald Wreath and NF associate Shelby Thornhill that their "sister" Rios had an $800 debt. Cramer stated that he would "take care of" Rios's debt by collecting $750 from Burns and contributing $50 of his own money. Burns called his mother again on February 3, 2007, and he stated that Silva had received $450 sent by Burns's mother. Burns instructed his mother to call Silva and say that she was sending an additional $300. On February 9, 2007, Gutierrez called Silva and discussed the distribution of the $800 Rios debt, which was being paid to three people through money orders. In a February 17, 2007 call, Gutierrez told Clayton

Clark, a member of Guzman's NF regiment, that the receipt for the third and final money order had been received.

Sergeant Livingston opined that, assuming the prosecution proved an extortion of Burns, the extortion was done for the benefit of, at the direction of, and in association with the NF. He explained, "Burns himself is an NR member selling drugs on behalf of the organization. It's done at the direction of NF members to collect the drug proceeds. . . . [¶] . . . [¶] It benefits the organization as that money in particular was sent back into the prisons to Rudy Miramontes, Antonio Guillen, and also Victor Esquibel."

### *The Assault on Joel Madrigal*

In early 2007, while Gutierrez and Miramontes were in custody at the Santa Clara County Jail, Gutierrez learned that Joel Madrigal, a San Jose Grande gang member who was also in custody at the jail, had provided information to the police. Gutierrez informed Miramontes that Madrigal was a police informant who "had to go." Gutierrez received a communication from Miramontes authorizing the removal of Madrigal. Gutierrez explained that only Miramontes, who was the NF regimental commander at the jail, could sanction the removal of Madrigal.

On February 24, 2007, Robert Talvera, an NR member and jail inmate, "sliced" Madrigal's face. Madrigal suffered a laceration that extended from his ear down to this mouth. A gang expert, Correctional Officer Dennis Gillote, testified that a cut from the mouth to the ear is known as a "puto mark" and is a common method the NF employs for removals. Officer Gillote saw Madrigals's injury, and he opined that the injury was consistent with a "puto mark."

After Madrigal's removal, Miramontes told Mendoza that he had authorized the removal. Mendoza explained that NF procedures required Madrigal's removal to be authorized by Miramontes, and that the removal could not have occurred without Miramontes's approval.

13

Sergeant Livingston opined that, assuming the prosecution proved an assault on Madrigal, the assault was done for the benefit of, at the direction of, and in association with the NF. He explained that the assault bolstered the NF's reputation, Miramontes sanctioned the assault, and a member of the organization carried out the assault.

### Defense Evidence

Debbie Maria Wade testified for Miramontes. Wade is the best friend of Miramontes's wife. Wade testified that Miramontes never told her that he was in a gang.

Ortiz did not present any evidence.

## DISCUSSION

### I. *Ineffective Assistance of Counsel*

Miramontes contends that the judgment against him must be reversed because his trial counsel rendered ineffective assistance in failing to object to the admission of evidence regarding the Mendoza street regiment and the Guzman street regiment. Miramontes does not point to individual items of evidence to which counsel should have objected. Rather, Miramontes broadly argues, "Counsel should have objected to the evidence pertaining to the Guzman and Mendoza regiments: to all the items that were seized in the various searches related to these regiments; and to all the communications by and among the members of those regiments in regard to selling methamphetamine or committing other crimes on behalf of the NF. . . . This evidence was irrelevant and inadmissible under [Evidence Code] section 352." As explained below, we conclude that Miramontes has failed to show that counsel's performance was deficient.

The defendant bears the burden of proving ineffective assistance of counsel. (*People v. Carter* (2003) 30 Cal.4th 1166, 1211 (*Carter*).) To obtain reversal due to ineffective assistance, a defendant must first show "that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003 (*Cunningham*); *Strickland v. Washington*

14

(1984) 466 U.S. 668, 688.) Second, the defendant must show that there is "a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings." (*Cunningham, supra,* 25 Cal.4th at p. 1003.)

"A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." (*Carter, supra,* 30 Cal.4th 1166, 1211; see also *People v. Witcraft* (2011) 201 Cal.App.4th 659, 664.) Where the record on appeal "does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation." (*People v. Anderson* (2001) 25 Cal.4th 543, 569.)

In the instant case, the record does not show the reason for counsel's failure to object to the evidence regarding the Guzman and Mendoza regiments. Because we believe that a satisfactory explanation exists, we cannot find deficient performance.

Contrary to Miramontes's assertion, the evidence regarding the Mendoza and Guzman regiments was not irrelevant. The evidence was relevant to prove the conspiracy to sell methamphetamine. The indictment alleged that there were five overt acts in the conspiracy. The first overt act was that "the Nuestra Familia Organization on and between January 1, 2002 and December 4, 2008, established active street regiments for the purpose of carrying out criminal activities for the gang." The fifth overt act was that "the Nuestra Familia Organization on and between January 1, 2002 and December 4, 2008, would send directives to the street regiments on how to conduct criminal activities on behalf of the organization." Evidence regarding the Mendoza and Guzman regiments' methamphetamine sales, criminal activities, and communications was relevant to prove the first and fifth overt acts of the conspiracy. (See generally Evid. Code, § 210 [evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action"].) Thus, counsel was not deficient in failing to object to the evidence as irrelevant. (See *People v.*

15

*Morales* (1979) 88 Cal.App.3d 259, 266 ["Failure to object to relevant evidence . . . is not the mark of inadequate representation nor incompetent counsel."].)

We also conclude that counsel was not deficient in failing to object to the evidence pursuant to Evidence Code section 352. Evidence Code section 352 states, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." We are not persuaded by Miramontes's claim that the Guzman and Mendoza regiment evidence was unduly prejudicial, unduly time consuming, and cumulative. Citing the inflammatory nature of gang evidence in general, Miramontes asserts that the Guzman and Mendoza regiment evidence was necessarily unduly prejudicial. Miramontes's argument ignores the fact that the indictment alleged an NF-wide conspiracy to sell methamphetamine, and that the indictment alleged that the conspiracy was committed for the benefit of the NF gang. "[G]iven the breadth and centrality of the gang issues in this matter, it is doubtful that many Evidence Code section 352 objections would have been sustained. Failure to make meritless objections cannot be the basis of an ineffective assistance of counsel claim." (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1170.) Moreover, we do not believe that the Guzman and Mendoza regiment evidence was unduly time consuming; this case involved a complex, far-reaching conspiracy, and the evidence regarding the Guzman and Mendoza regiments played a small part in the prosecution's establishment of the conspiracy. Finally, we are unconvinced by Miramontes's claim that the evidence "was clearly cumulative." Given Miramontes's failure to identify specific items of evidence and failure to explain how those items of evidence were cumulative to other pieces of evidence that established the NF methamphetamine conspiracy, we cannot conclude that the Guzman and Mendoza regiment evidence was cumulative and thus objectionable under Evidence Code section 352. (See *U.S. v. Cronic* (1984) 466 U.S. 648, 666 [a defendant "can . . . make out a

16

claim of ineffective assistance only by pointing to specific errors"].) We thus conclude that counsel was not deficient in failing to object to the Mendoza and Guzman regiment evidence pursuant to Evidence Code section 352.

Accordingly, we conclude that counsel's conduct fell within the wide range of professional competence. We therefore hold that counsel did not render ineffective assistance. (See generally *People v. Castaneda* (2011) 51 Cal.4th 1292, 1335 [the "decision whether to object to the admission of evidence is 'inherently tactical,' and a failure to object will rarely reflect deficient performance by counsel"].)

## II. *Sufficiency of the Evidence Supporting Miramontes's Conspiracy Conviction*

Miramontes contends that there was insufficient evidence to support his conviction for conspiracy to sell methamphetamine. He does not dispute the existence of an NF conspiracy to sell methamphetamine, and he instead argues that his conspiracy conviction "must be reversed for insufficient evidence that he intended to agree and actually did agree with the co-conspirators to sell meth." As set forth below, we conclude that the prosecution presented substantial evidence in support of the conspiracy conviction.

### A. *Standard of Review*

"When considering a challenge to the sufficiency of the evidence to support a criminal conviction, we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Cortes* (1999) 71 Cal.App.4th 62, 71.) "In making this determination, we do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses." (*Ibid.*)

### B. *There Was Sufficient Evidence of Agreement and Intent to Agree*

Penal Code section 182 prohibits a conspiracy by two or more people to "commit any crime." (Pen. Code, § 182, subd. (a)(1).) "A conviction for conspiracy requires proof of four elements: (1) an agreement between two or more people, (2) who have the

17

specific intent to agree or conspire to commit an offense, (3) the specific intent to commit that offense, and (4) an overt act committed by one or more of the parties to the agreement for the purpose of carrying out the object of the conspiracy." (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1024 (*Vu*).)

"In proving a conspiracy . . . it is not necessary to demonstrate that the parties met and actually agreed to undertake the unlawful act or that they had previously arranged a detailed plan. The evidence is sufficient if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. Therefore, conspiracy may be proved through circumstantial evidence inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy." (*People v. Prevost* (1998) 60 Cal.App.4th 1382, 1399.)

Here, there was substantial evidence that Miramontes intended to agree and did in fact agree to engage in methamphetamine sales with other NF members. The evidence established that Miramontes asserted control over the Cramer regiment, an NF regiment engaged in methamphetamine sales, while Miramontes was in custody at the Santa Clara County Jail: Miramontes stated his intention to take over the Cramer regiment, Miramontes told Mendoza that he was collecting money owed to the Cramer regiment, and Mendoza testified that Miramontes "basically asserted control over" the Cramer regiment while in custody at the jail. The evidence also showed that Miramontes was involved in NF methamphetamine sales beyond the Cramer regiment. When he was the NF regimental commander at the jail, Miramontes ordered that methamphetamine smuggled into the jail was to be given to NF leadership at the jail. Mendoza testified that Miramontes ran an NF street regiment upon release from jail in 2007. Mendoza also testified that NF general Guillen directed Miramontes to assume authority over all NF street regiments in Santa Clara County—regiments that both Mendoza and Sergeant Livingston testified were involved in methamphetamine sales. The foregoing evidence, although circumstantial in nature, strongly suggested that Miramontes intended to agree

18

and actually agreed to engage in methamphetamine sales with other NF members. We therefore conclude that Miramontes's conspiracy conviction was supported by substantial evidence of agreement and intent to agree. (See generally *Vu, supra*, 143 Cal.App.4th at p. 1024 [circumstantial evidence may be sufficient to prove guilt beyond a reasonable doubt].)

Miramontes contends that the indictment charged a conspiracy only among the members of the Campa and Ramirez regiments, and that his conspiracy conviction must be reversed because there was no evidence that he agreed to sell methamphetamine for those particular regiments. Miramontes's argument is unavailing because the indictment alleged an NF-wide conspiracy to sell methamphetamine, not just a conspiracy among the members of the Campa and Ramirez regiments. As discussed in section I, *ante*, the indictment alleged overt acts pertaining to all NF regiments. Although the indictment alleged three overt acts pertaining to the Campa and Ramirez regiments, those allegations did not transform the charged NF-wide conspiracy into a conspiracy among only the members of the Campa and Ramirez regiments. Thus, the prosecution was not required to prove that Miramontes agreed to sell methamphetamine for the Campa and Ramirez regiments. (See generally *People v. Russo* (2001) 25 Cal.4th 1124, 1135 [to convict a defendant of conspiracy, a jury has to find only one overt among several possible overt acts].)

Moreover, although there was no direct evidence that Miramontes entered into an agreement with members of the Campa and Ramirez regiments, the evidence suggested that Miramontes tacitly agreed to sell methamphetamine in conjunction with those individuals. The evidence established that all NF regiments in Santa Clara County sold methamphetamine for the organization, and that all NF regiments sold methamphetamine in order to send money to incarcerated NF members. The existence of this common scheme and goal suggests that Miramontes and members of all the NF regiments, including members of the Campa and Ramirez regiments, tacitly agreed to jointly engage

19

in methamphetamine sales on behalf of the NF. We therefore are not persuaded by Miramontes's argument, and we must conclude that sufficient evidence supported his conspiracy conviction.

## III. *Corroboration of Coconspirator Hearsay Statements*

The prosecution relied on the jail calls to prove the extortion of Burns. The jail calls were admitted under Evidence Code section 1223, the coconspirator statement exception to the hearsay rule.[3] Miramontes contends that his extortion conviction must be reversed because insufficient evidence corroborated the coconspirator statements in the jail calls. He further contends that his extortion conviction must be reversed because the trial court failed to sua sponte instruct the jury that the coconspirator statements in the jail calls required corroboration and were to be viewed with distrust. His arguments are premised on the assumption that the coconspirator hearsay statements in the jail calls were accomplice testimony that required corroboration under Penal Code section 1111.

Penal Code section 1111 states that a "conviction can not be had upon the *testimony* of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense." (Pen. Code, § 1111, italics added.) Miramontes correctly points out that coconspirators are accomplices for purposes of Penal Code section 1111. (See *People v. Stankewitz* (1990) 51 Cal.3d 72, 90.) Miramontes fails, however, to articulate how the coconspirator hearsay statements in the jail calls constituted testimony within the meaning of Penal Code section 1111.

---

[3] Evidence Code section 1223 states: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if: [¶] (a) The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy; [¶] (b) The statement was made prior to or during the time that the party was participating in that conspiracy; and [¶] (c) The evidence is offered either after admission of evidence sufficient to sustain a finding of the facts specified in subdivisions (a) and (b) or, in the court's discretion as to the order of proof, subject to the admission of such evidence."

20

Without any analysis, he simply asserts that the out-of-court statements in the jail calls were testimony falling within the ambit of Penal Code section 1111.

Testimony within the meaning of Penal Code section 1111 "includes all oral statements made by an accomplice or coconspirator under oath in a court proceeding and all out-of-court statements of accomplices and coconspirators used as substantive evidence of guilt which are made under suspect circumstances." (*People v. Jeffery* (1995) 37 Cal.App.4th 209, 218, italics omitted.) In *People v. Williams* (1997) 16 Cal.4th 635 (*Williams*), our Supreme Court held that coconspirator hearsay statements admitted pursuant to Evidence Code section 1223 were not testimony that required corroboration under Penal Code section 1111. (*Id.* at p. 682.) *Williams* employed the following reasoning: " 'The usual problem with accomplice testimony—that it is consciously self-interested and calculated—is not present in an out-of-court statement that is *itself sufficiently reliable* to be allowed into evidence.' [Citation.] Here, statements made in the course of and in furtherance of the conspiracy were not made under suspect circumstances and therefore were sufficiently reliable to require no corroboration." (*Ibid.*, italics in original.)

*Williams* compels us to conclude that the jail calls were not testimony within the meaning of Penal Code section 1111. Like *Williams,* the jail calls were admitted under the coconspirator statement exception to the hearsay rule. *Williams* implied that such coconspirator hearsay statements are inherently reliable and not self-interested. (See *Williams, supra,* 16 Cal.4th at p. 682; see also Evid. Code, § 1223 [coconspirator hearsay statements are admissible *only* if made in "furtherance of the objective of that conspiracy"].) Also like *Williams*, the jail calls were not made under suspect circumstances. The statements in the calls pertained to the ongoing collection of an NF methamphetamine debt—the statements therefore cannot be considered unreliable statements aimed at "shifting blame" to Miramontes. (*People v. Cook* (2006) 39 Cal.4th 566, 601 [accomplice testimony requires corroboration because of the "accomplice's self-

21

interest in shifting blame to the defendant"].)   Indeed, Miramontes fails to point to any evidence that suggests that the jail calls were made under suspect circumstances. *Williams* thus impels us to conclude that the prosecution was not required to present evidence to corroborate the jail calls, and that the trial court was not required to instruct the jury that the jail calls required corroboration and were to be viewed with distrust.

## IV. *Uncharged Conspiracy Instructions*

Miramontes asserts that his extortion conviction must be reversed because the trial court failed to sua sponte instruct the jury regarding "an uncharged conspiracy theory." His argument is premised on the assumption that the jail calls were admitted under Evidence Code section 1223 as coconspirator hearsay statements made during an uncharged conspiracy to extort money from Burns.  As explained below, the record belies Miramontes's claim.

Where the prosecutor does not charge conspiracy as an offense, but introduces evidence of a conspiracy to prove liability, the trial court has a "sua sponte duty to give uncharged conspiracy instructions." (*People v. Williams* (2008) 161 Cal.App.4th 705, 709.) Thus, where hearsay statements made as part of an uncharged conspiracy are admitted pursuant to Evidence Code section 1223, the trial court has a "sua sponte duty to instruct the jury on the definition of an uncharged conspiracy." (*People v. Sully* (1991) 53 Cal.3d 1195, 1231; see also *People v. Earnest* (1975) 53 Cal.App.3d 734, 744-745 [where statements made during an uncharged conspiracy are admitted under Evidence Code section 1223, the trial court has a sua sponte duty to define the uncharged conspiracy].)

Here, contrary to Miramontes's assertion, the jail calls were not admitted as hearsay statements made during an uncharged conspiracy to commit extortion.  When the prosecutor originally made arguments to the court regarding the admissibility of the jail calls, he argued the hearsay statements in the calls were "statements of the coconspirators in the conspiracy of selling methamphetamine as well as . . . statements made in the

22

commission of a [conspiracy] to commit an extortion of Mr. Burns." In a later argument to the court, however, the prosecutor abandoned the uncharged conspiracy theory and argued the jail calls were admissible solely on the theory that they were coconspirator hearsay statements made during the charged methamphetamine conspiracy. The prosecutor then provided a lengthy explanation regarding the relationship between the jail calls and the charged methamphetamine conspiracy. In response to the prosecutor's argument, Miramontes's counsel noted that "the People have conceded the point" that the jail calls were not offered as part of a "conspiracy of extortion against Mr. Burns." Shortly thereafter, the court ruled that it was admitting the jail calls under Evidence Code section 1223 "based on the People's offer of proof." Thus, although the prosecutor originally suggested that the jail calls could be admitted as coconspirator hearsay statements made during an uncharged extortion conspiracy, the record shows that the jail calls were actually admitted as coconspirator hearsay statements made during the charged methamphetamine conspiracy.

The prosecutor's closing argument confirmed that the jail calls were admitted as coconspirator hearsay statements made during the charged methamphetamine conspiracy. During his closing argument, the prosecutor explained that the jury could consider the jail calls as evidence against Miramontes only if the hearsay statements in the calls were made as part of "a conspiracy to sell methamphetamine on behalf of the Nuestra Familia." The prosecutor's closing argument in no way suggested that the jail calls were part of an uncharged conspiracy to commit extortion.

The record therefore demonstrates that the jail calls were not admitted as coconspirator hearsay statements made during an uncharged extortion conspiracy. Thus, because the prosecution did not rely on an uncharged conspiracy to establish liability, the trial court did not have a sua sponte duty to give uncharged conspiracy instructions.

23

**V.** *Admission of the Jail Phone Calls*

Miramontes contends that his extortion conviction must be reversed because the trial court prejudicially erred in admitting the jail calls. He first asserts that the jail calls were inadmissible under Evidence Code section 1223. He additionally asserts that the trial court erred in refusing to exclude portions of the jail calls pursuant to Evidence Code section 352. As explained below, Miramontes's arguments are unpersuasive.

**A.** *Standard of Review*

"We review the trial court's rulings on the admission of evidence for abuse of discretion." (*People v. Cowan* (2010) 50 Cal.4th 401, 462.) We therefore review Miramontes's claims regarding Evidence Code sections 1223 and 352 for abuse of discretion.

**B.** *Evidence Code Section 1223*

As previously noted, the trial court admitted the jail calls under Evidence Code section 1223, on the theory that the hearsay statements in the calls were part of the charged conspiracy to sell methamphetamine. Miramontes contends that the trial court erred in admitting the jail calls under Evidence Code section 1223 because the hearsay statements in the calls were not made to further the objective of the methamphetamine conspiracy. He also contends that the jail calls were erroneously admitted pursuant to Evidence Code section 1223 because none of the declarants in the jail calls were members of Campa's NF regiment or Ramirez's NF regiment.[4]

---

[4] Miramontes also makes several arguments that are premised on the assumption that the jail calls were admitted as coconspirator hearsay statements made during "an uncharged conspiracy to extort money from Burns." Because the jail calls were admitted as coconspirator hearsay statements made during the charged methamphetamine conspiracy, we will not address any of Miramontes's arguments pertaining to the improper admission of the jail calls as coconspirator hearsay statements made during an uncharged extortion conspiracy.

24

Hearsay statements by coconspirators are admissible under Evidence Code section 1223 "if, at the threshold, the offering party presents 'independent evidence to establish prima facie the existence of . . . [a] conspiracy.' " (*People v. Hardy* (1992) 2 Cal.4th 86, 139 (*Hardy*).) "Once independent proof of a conspiracy has been shown, three preliminary facts must be established:  '(1) that the declarant was participating in a conspiracy at the time of the declaration; (2) that the declaration was in furtherance of the objective of that conspiracy; and (3) that at the time of the declaration the party against whom the evidence is offered was participating or would later participate in the conspiracy.' " (*Ibid.*)

Miramontes's claim that the jail calls did not further the objective of the methamphetamine conspiracy is vague and very brief; in a one-sentence argument he asserts that the trial court erred in admitting the jail calls "because statements pertaining to the extortion were not made to further the conspiracy to sell methamphetamine." Miramontes appears to be arguing that because the statements in the jail calls showed an effort to extort money from Burns, the statements could not also have been made to further the objective of the NF conspiracy to sell methamphetamine.  Such an argument is unpersuasive.  Collection of money is the goal of the sale of methamphetamine.  (See *People v. Lazenby* (1992) 6 Cal.App.4th 1842, 1845 [a sale of narcotics is a transfer of narcotics for cash].)  Thus, the statements in the jail calls, which showed a coercive effort to collect the proceeds of NF methamphetamine sales from Burns, can be viewed as statements made to further the objective of the conspiracy to sell methamphetamine. Moreover, Miramontes's argument ignores the principle that "whether statements made are in furtherance of a conspiracy depends on an analysis of the totality of the facts and circumstances in the case." (*Hardy, supra,* 2 Cal.4th at p. 146.) The evidence here established that the NF fronted methamphetamine to its sellers, that sellers were obligated to pay the NF for the drugs, that sellers who failed to pay the NF were placed on the BNL and were subject to assault, and that Burns was a seller who had failed to pay the NF.

25

The totality of the facts and circumstances therefore shows that the jail calls—calls directed at collecting drug money Burns owed to the NF—were made in furtherance of the charged NF conspiracy to sell methamphetamine. We therefore find no merit in Miramontes's claim that the jail calls were not made to further the objective of the methamphetamine conspiracy.

We are also unconvinced by Miramontes's claim that Evidence Code section 1223 required the declarants in the jail calls to be members of the Campa regiment or the Ramirez regiment. Miramontes does correctly assert that Evidence Code section 1223 applies only to declarants who are "participating in a conspiracy." (Evid. Code, § 1223.) His argument fails, however, because it is premised on the erroneous assumption that the indictment charged a methamphetamine conspiracy only among the members of the Campa and Ramirez regiments. As we have previously explained, the indictment alleged an NF-wide conspiracy to sell methamphetamine, not a conspiracy confined to the Campa and Ramirez regiments. The evidence at trial confirmed that the conspiracy to sell methamphetamine was far-reaching and not limited to members of the Campa and Ramirez regiments. Consequently, the circumstance that the declarants were not members of the Campa regiment or the Ramirez regiment in no way precluded the admission of the jail calls under Evidence Code section 1223.

Miramontes has thus failed to identify any error in the admission of the jail calls pursuant to Evidence Code section 1223. We therefore find no abuse of discretion in the trial court's admission of the calls pursuant to that section.

### C. *Evidence Code Section 352*

Before the jail calls were played for the jury, Miramontes's trial counsel objected to the admission of the calls under Evidence Code section 352. The asserted grounds for the objection were "relevance," "prejudicial value," and "confusion." The trial court

overruled the objection. Miramontes's counsel noted that he "would like the record to reflect that from this point forward there would be a standing objection to the submission of any of those phone calls."

In a brief and conclusory argument, Miramontes now contends that the trial court erred in refusing to exclude "portions" of the jail calls pursuant to Evidence Code section 352. He asserts that "several of the calls, or portions of calls had nothing to do with the extortion of Burns." He further asserts that the "calls, or portions of calls . . . that had nothing to do with the extortion of Burns were irrelevant, more prejudicial than probative, and their admission consumed an undue amount of time." Miramontes fails to identify the specific statements that "had nothing to do with the extortion of Burns" and were thus subject to exclusion under Evidence Code section 352.

"To demonstrate error, [an] appellant must present . . . facts in the record that support the claim of error." (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.) "The reviewing court is not required to make an independent, unassisted study of the record in search of error . . . . It is entitled to the assistance of counsel." (9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 701, p. 769.) An appellate court is "not required to search the record to ascertain whether it contains support for [the appellant's] contentions." (*Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545.)

Here, the trial court admitted 35 jail calls into evidence, and the calls were played for the jury over the course of two days. Miramontes fails to identify particular statements within those 35 calls that should have been excluded under Evidence Code section 352. We have no duty to review the large volume of calls and search for statements that were potentially subject to exclusion under Evidence Code section 352. Thus, Miramontes has failed to show that the trial court abused its discretion in issuing its Evidence Code section 352 ruling.

**VI.** *Severance*

Ortiz contends that the trial court abused its discretion in denying his severance motion. He asserts that the trial court was required to completely sever his case from Miramontes's case or, at the very least, sever the counts charging Miramontes with assault and extortion from the counts jointly charging him and Miramontes with conspiracy and active gang participation. He alternatively argues that joinder of his case with Miramontes's case resulted in a due process violation. As explained below, we find no abuse of discretion in the denial of the severance motion, and we find no due process violation.

**A.** *Background*

Before trial, Ortiz filed a severance motion. He argued that the counts charging Miramontes with assault and extortion should be severed from the counts jointly charging him and Miramontes with conspiracy and active gang participation. He also suggested that his case should be completely severed from Miramontes's case. He emphasized that joinder was not authorized by Penal Code section 954, and that joinder would be prejudicial because Miramontes was charged with violent offenses.

The prosecutor argued that joinder was appropriate. He emphasized that the crimes charged against Ortiz and Miramontes were "interrelated" because they were all committed in association with the NF. He also emphasized that the same gang evidence would be introduced if Ortiz and Miramontes were tried separately.

The trial court ruled that joinder was appropriate, and it denied Ortiz's severance motion. The court noted that the jury would "be able to sort out the issues regarding the various counts against Mr. Miramontes that are separate and distinct from the ones that are jointly shared."

28

**B.** *Standard of Review*

A "trial court's rulings on joinder are reviewed for abuse of discretion." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1074.) "An appellate court reviews a trial court's ruling on a motion for separate trials for abuse of discretion." (*People v. Alvarez* (1996) 14 Cal.4th 155, 189 (*Alvarez*).)

**C.** *The Trial Court Did Not Abuse its Discretion in Denying the Severance Motion*

In arguing that the trial court abused its discretion in denying his severance motion, Ortiz first asserts that Penal Code section 954 did not authorize joinder of his charges with Miramontes's charges. He next asserts that the trial court abused its discretion in denying the severance motion because the evidence pertaining to Miramontes's crimes was prejudicial, inflammatory, and not cross-admissible at a separate trial.[5]

Penal Code section 954 states that an "accusatory pleading may charge two or more different offenses connected together in their commission." If offenses are connected together in their commission within the meaning of Penal Code section 954, "it is permissible not only to join a number of counts against a single defendant but also a number of counts against different defendants." (4 Witkin, Cal. Crim. Law (4th ed. 2012) Pretrial Proceedings, § 237, p. 495.) Penal Code section 1098 states that "[w]hen two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order separate trials." "The

---

[5] Ortiz does not assert that that he and Miramontes had conflicting defenses, that Miramontes would have given exonerating testimony at a separate trial, or that Miramontes made an incriminating confession. (See *People v. Cleveland* (2004) 32 Cal.4th 704, 726 [separate trials may be necessary "if a codefendant has made an incriminating confession, association with codefendants may be prejudicial, evidence on multiple counts may cause confusion, there may be conflicting defenses, or a codefendant may give exonerating testimony at a separate trial"].)

29

Legislature has in this manner expressed a preference for joint trials." (*People v. Boyde* (1988) 46 Cal.3d 212, 231.) Thus, "a trial court *must* order a joint trial as the 'rule' and *may* order separate trials only as an 'exception.' " (*Alvarez, supra,* 14 Cal.4th at p. 190, italics in original.)

We first determine whether the trial court erred in concluding that joinder of all the charges was authorized by Penal Code section 954. Offenses are "connected together in their commission" within the meaning of Penal Code section 954 if they are linked by a " ' " 'common element of substantial importance.' " ' " (*People v. Mendoza* (2000) 24 Cal.4th 130, 160 (*Mendoza*).) Here, Ortiz and Miramontes were both charged with active participation in the NF, and they were both charged with conspiracy to sell methamphetamine for the benefit of, at the direction of, and in association with the NF. Likewise, Miramontes's extortion and assault charges were both alleged to have been committed for the benefit of, at the direction of, and in association with the NF. The "intent or motivation with which different acts are committed can qualify as a 'common element of substantial importance' . . . and establish that such crimes were 'connected together in their commission.' " (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1219.) Thus, the circumstance that all of the charges here were alleged to have been committed on behalf of the NF was a common element of substantial importance that linked the charged crimes. We therefore conclude that Penal Code section 954 authorized joinder of all the charges.

Given our conclusion that joinder was authorized by Penal Code section 954, we must next determine whether Ortiz has made a clear showing of prejudice: "When, as here, the statutory requirements for joinder are met, a defendant must make a clear showing of prejudice to establish that the trial court abused its discretion in denying the defendant's severance motion. [Citations.] In determining whether there was an abuse of discretion, we examine the record before the trial court at the time of its ruling. [Citation.] The factors to be considered are these: (1) the cross-admissibility of the

30

evidence in separate trials; (2) whether some of the charges are likely to unusually inflame the jury against the defendant; (3) whether a weak case has been joined with a strong case or another weak case so that the total evidence may alter the outcome of some or all of the charges; and (4) whether one of the charges is a capital offense, or the joinder of the charges converts the matter into a capital case." (*Mendoza, supra,* 24 Cal.4th at pp. 160-161; see also *People v. Keenan* (1988) 46 Cal.3d 478, 500.) Cross-admissibility "ordinarily dispels any inference of prejudice." (*Mendoza, supra,* 24 Cal.4th at p. 161.)

Here, the evidence would have been cross-admissible at separate trials. As previously noted, Ortiz and Miramontes were jointly charged with active participation in the NF and conspiring to sell methamphetamine for the NF. Thus, identical expert testimony regarding the structure of the NF and identical evidence regarding the NF's methamphetamine sales could have been admitted at separate trials. Additionally, although Ortiz was not involved in the extortion and assault charged against Miramontes, evidence regarding the extortion and assault could have been admitted if Ortiz had been tried separately. In order to prove Ortiz's active gang participation charge and the gang enhancement attached to Ortiz's conspiracy charge, the prosecution had to prove that the NF "engaged in a pattern of criminal gang activity." (Pen. Code, § 186.22, subd. (a) [prosecution must prove pattern of criminal activity for charge of active gang participation]; *People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436 [prosecution must prove pattern of criminal activity for gang enhancement].) The prosecution could introduce evidence of several predicate gang offenses to establish the pattern of criminal gang activity. (*People v. Rivas, supra,* 214 Cal.App.4th at p. 1435-1436 [holding that admission of evidence of six predicate offenses was proper].) Thus, evidence regarding Miramontes's assault and extortion could have been admitted at a separate trial in order to prove the predicate offenses required for Ortiz's active gang participation charge and gang enhancement. (See Pen. Code, § 186.22, subd (e)(1) [assault with a deadly weapon is a predicate offense]; Pen. Code, § 186.22, subd (e)(19) [felony extortion is a predicate

31

offense].)  The existence of this cross-admissibility suggests that the trial court did not abuse its discretion in denying Ortiz's severance motion.  (See *People v. Soper* (2009) 45 Cal.4th 759, 775 [cross-admissibility "alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges"].)

Other factors also show that the trial court did not abuse its discretion in denying the severance motion.  The evidence against Ortiz was strong.  Methamphetamine and digital scales were found inside Ortiz's home, police officers witnessed Ortiz engage in apparent narcotics transactions, NR members Tirri and Martinez explained that Ortiz sold methamphetamine for the NF, and Tirri explicitly informed Ortiz that the methamphetamine was supplied by the NF.  This therefore is not a situation where a weak case was joined with a strong case so as to alter the outcome of the offenses charged against Ortiz.  Nor do we believe that joinder of Ortiz's case with Miramontes's case was unusually likely to inflame the jury against Ortiz.  Although Miramontes's assault and extortion involved violence and threats of violence, so too did Ortiz's conspiracy charge involve violent conduct—it was undisputed that violence and threats of violence against NF methamphetamine sellers were a part of the NF methamphetamine conspiracy.  Finally, Miramontes was not charged with any capital offenses, so joinder did not convert the matter into a capital case.  The foregoing factors, combined with the cross-admissibility of the evidence, show that the trial court did not err in denying Ortiz's severance motion.

Accordingly, we conclude that the trial court did not abuse its discretion in refusing to completely sever Ortiz's case from Miramontes's case, and that the trial court did not abuse its discretion in refusing to sever the counts charging Miramontes with assault and extortion from the counts jointly charging Ortiz and Miramontes with active gang participation and conspiracy.  Next, we must determine whether the joint trial resulted in a due process violation.

32

### D. *The Joint Trial Did not Result in a Due Process Violation*

"Even if a trial court's severance or joinder ruling is correct at the time it was made, a reviewing court must reverse the judgment if the "defendant shows that joinder actually resulted in 'gross unfairness' amounting to a denial of due process." (*Mendoza, supra,* 24 Cal.4th at p. 162.) Here, Ortiz contends that he suffered a due process violation because the joinder of his case with Miramontes's case "resulted in the introduction of huge amounts of evidence not admissible in a separate trial." He emphasizes that much of the evidence presented at the joint trial was gang evidence and thus "of a particularly prejudicial nature."

We do not believe that joinder resulted in a due process violation. As we have previously explained, evidence pertaining to Miramontes's crimes could have been admitted if Ortiz had been tried separately. Moreover, given that Ortiz was charged with active participation in the NF and engaging in a far-reaching NF conspiracy to sell methamphetamine, a significant amount of gang evidence would have been admissible at a separate trial. We therefore cannot conclude that Ortiz suffered gross unfairness as a result of the gang evidence presented at the joint trial. An analysis of the jury instructions also suggests that there was no due process violation. The trial court instructed the jury that gang evidence could be considered "only for the limited purpose" of reaching a verdict on the active gang participation charge and the gang enhancements, and it specifically instructed the jury that gang evidence could not be considered to prove that Ortiz "is a person of bad character or that he has a disposition to commit crimes." The trial court also instructed the jury that Ortiz was "individually entitled to" a determination of whether he was a member of the charged conspiracy. During the presentation of evidence, the trial court informed the jury that evidence pertaining to the assault on Madrigal could not be considered against Ortiz. The foregoing instructions alleviated potential prejudice stemming from the joint trial. Accordingly, based on all of the circumstances described above, we conclude that the joint trial did cause gross

unfairness amounting to a denial of due process. (See generally *People v. Valdez* (2004) 32 Cal.4th 73, 120-121 [joinder did not result in a due process violation where evidence was cross-admissible].)

## VII. *Admission of the "Toltec" Letter*

Ortiz contends that the trial court erred in admitting a letter referred to as the "Toltec" letter. He asserts that the Toltec letter was inadmissible hearsay. He has failed, however, to provide this court with a copy of the Toltec letter.

### A. *Background*

When police officers searched Ortiz's house in May 2007, they seized a letter signed by "Mr. Toltec" and addressed to "Raton," Ortiz's gang moniker. This letter, referred to as the Toltec letter at trial, was admitted into evidence as People's exhibit 259. Defense counsel objected to the admission of the Toltec letter, arguing that it was inadmissible hearsay. The trial court overruled the objection.

The prosecutor showed Mendoza the Toltec letter, and he asked Mendoza whether he had an opinion as to whether the author and recipient were associated with the NF or the NR. Mendoza opined that the author and the recipient were affiliated with the NF or the NR. In explaining the basis of his opinion, Mendoza noted that the Toltec letter was partially written in the Nahuatl language, the salutation and sign-off in the letter were commonly used in NF communications, and the letter contained a star that many NR members use. Mendoza also noted that a portion of the letter, which mentioned "education," was a reference to Norteno schooling.

### B. *Ortiz Has Failed to Show that the Letter Was Improperly Admitted*

The appellant must provide this court with an adequate record demonstrating the alleged error. Failure to provide an adequate record on an issue requires that the issue be resolved against the appellant. (*Maira P. v. Riles* 43 Cal.3d 1281, 1295-1296.)

Given that Ortiz has failed to provide this court with a copy of the Toltec letter, we are unable to evaluate the letter and determine whether it was improperly admitted into

34

evidence. Because Ortiz has failed to provide an adequate record, we must deem his claim meritless.

Moreover, based on the limited record before us, it does not appear that the letter was even hearsay. Hearsay is defined as "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Based on the record before us, it does not appear that the Toltec letter was offered to prove the truth of the statements in the letter. Rather, it appears that the letter was offered because it contained language and symbolism associated with the NF, and Ortiz's possession of such a document in turn showed his affiliation with the NF.

Finally, the claim also fails because Ortiz has not shown that he was prejudiced by the admission of the Toltec letter. Ortiz asserts that he was prejudiced by the admission of the Toltec letter because it was the only evidence that established his affiliation with the NF. Contrary to Ortiz's assertion, copious evidence established his affiliation with the NF: Tirri and Martinez both testified that Ortiz sold methamphetamine for the NF, Tirri testified that Ortiz was a member of Ramirez's NF regiment, Tirri explained that Ortiz paid dues to the NF, and Sergeant Livingston opined that Ortiz was an associate of the NF. Given the very strong evidence establishing Ortiz's affiliation with the NF, Ortiz has failed to show the requisite reasonable probability of a more favorable verdict had the Toltec letter been excluded. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 671 [when evidence is erroneously admitted, reversal is required only if there is a "reasonable probability the jury would have reached a more favorable verdict" absent the error].)

## VIII. *Immunity*

Ortiz and Miramontes contend that the trial court was required to grant immunity to prosecution witnesses Ramirez and Tirri for testimony regarding an incident referred to as the "pruno incident." They alternatively argue that the trial court should have compelled the prosecutor to confer such immunity by "giving the prosecutor the choice

between granting immunity or having the witnesses' testimony stricken." They assert that immunity was necessary because testimony regarding the pruno incident would have impeached Ramirez's credibility and Tirri's credibility. We find no merit in these claims.

## A. *Background*

A few days before Tirri and Ramirez testified at trial, they allegedly participated in an altercation at the jail, which was referred to as the pruno incident in the trial court. A jail incident report described the pruno incident. The report stated the following: Tirri, Ramirez, Mendoza, and at least six other inmates drank homemade alcohol called pruno, those inmates engaged in a fight, Tirri and others suffered injuries during the fight, and Tirri later denied being involved in the fight. A witness gave an investigating officer the following explanation regarding the impetus for the fight: "Some of the inmates were talking about the deals they had made for their reduced or modified sentences. This discussion turned to the individual they were 'giving up' for their deals and one of them said they didn't care if anyone had a problem with what they were doing."

Ortiz and Miramontes sought to cross-examine Ramirez and Tirri regarding the pruno incident, arguing that testimony pertaining to the incident would impeach Ramirez's and Tirri's credibility. Tirri and Ramirez both invoked the Fifth Amendment privilege against self-incrimination and refused to answer questions regarding the pruno incident. The prosecutor declined to grant Ramirez and Tirri immunity for testimony regarding the pruno incident. Ortiz and Miramontes requested that the trial court grant Ramirez and Tirri immunity for testimony regarding the pruno incident. The trial court refused to grant such immunity. The court noted that it did not "think the court has the power to grant immunity to a witness."

At the conclusion of Ramirez's and Tirri's testimony, Ortiz suggested that the trial court could give the prosecutor a "choice" between the striking of Tirri's entire testimony or a prosecutorial grant of immunity for Tirri's testimony regarding the pruno incident. The court refused to present the prosecutor with such a choice. The court also declined to

36

strike Tirri's and Ramirez's testimony. The court noted that Ortiz and Miramontes were not prejudiced by the inability to question Ramirez and Tirri regarding the pruno incident because the "jury has heard considerable information about these witnesses' past, their gang activities, their numerous crimes committed." The court explained that Ramirez and Tirri had been subjected to thorough cross-examination, and that there was "plenty of information for the jury to assess each witness's credibility, reliability, and accuracy."

### B. *The Claims are Meritless*

Our Supreme Court has held: "[T]here is no authority in this state for the proposition that a prosecutor must request or the trial court must grant immunity to a witness on the ground that the witness's testimony could be favorable to the defense." (*People v. Cudjo* (1993) 6 Cal.4th 585, 619 (*Cudjo*).) Indeed, the Supreme Court has characterized as "doubtful" the "proposition that the trial court has inherent authority to grant immunity." (*People v. Lucas* (1995) 12 Cal.4th 415, 460.) Thus, because there is no authority for the immunity proposed by Ortiz and Miramontes, their claims necessarily fail.[6]

Moreover, even if we assumed that the trial court had the power to grant immunity or the power to compel the prosecutor to grant immunity, the claims would still fail. The Supreme Court has stated that, supposing the trial court does possess the power to grant immunity, "such immunity would be required only if the witness's testimony was both

---

[6] Ortiz contends that a Ninth Circuit case, *United States v. Straub* (9th Cir. 2008) 538 F.3d 1147 (*Straub*), required the trial court to grant immunity or compel the prosecutor to grant immunity. His reliance on *Straub* is unavailing. "[D]ecisions by the federal courts of appeal are not binding on us." (*People v. Williams* (2013) 56 Cal.4th 630, 668.) In contrast, decisions of the California Supreme Court " 'are binding upon and must be followed by all the state courts of California.' " (*People v. Superior Court (Moore)* (1996) 50 Cal.App.4th 1202, 1211.) Thus, we are bound by the California Supreme Court's conclusion that there is no authority that requires a trial court or a prosecutor to grant immunity, and we cannot conclude that *Straub* required the trial court to grant immunity or compel the prosecutor to grant immunity.

37

clearly exculpatory and essential to an effective defense, and if no strong governmental interest weighed against the grant of immunity." (*Cudjo, supra,* 6 Cal.4th at p. 619.) The claims here fail because Ramirez's and Tirri's potential testimony regarding the pruno incident was not clearly exculpatory. As the trial court noted, ample evidence impeached Tirri's credibility and Ramirez's credibility. Thus, testimony regarding the pruno incident was not essential to show that Tirri and Ramirez had impaired credibility. Moreover, contrary to Ortiz's assertion, there is no indication that Tirri and Ramirez "discussed their testimony" and "coordinate[d] their stories" during the pruno incident. Although a witness reported that individuals involved in the pruno incident discussed their plea deals, this report in no way constituted a showing that Tirri's and Ramirez's testimony was the product of collusion and thus unbelievable. Finally, we find no merit in Miramontes's contention that Tirri's and Ramirez's testimony regarding the pruno incident was necessary to impeach Mendoza's credibility; given that Mendoza was subjected to extensive cross-examination and testified at length regarding his extensive criminal history, Tirri's and Ramirez's testimony regarding the pruno incident was unnecessary to impeach Mendoza's credibility. Based on the foregoing circumstances, we cannot conclude that the potential testimony regarding the pruno incident was clearly exculpatory. Ortiz and Miramontes therefore have failed to demonstrate circumstances in which immunity conceivably could have been required.

Lastly, in a brief related argument, Ortiz and Miramontes contend that the trial court should have stricken Ramirez's testimony and Tirri's testimony. This claim is also unpersuasive. "Where a party cannot cross-examine a witness because the witness refuses to answer, the trial court may strike the direct examination. [Citation.] The decision whether to strike the direct examination is left to the discretion of the trial court, and the refusal to answer only one or two questions need not lead to the striking of the testimony." (*People v. Daggett* (1990) 225 Cal.App.3d 751, 760.) Here, Ramirez and Tirri refused to answer only the questions regarding the pruno incident, and they

38

submitted to lengthy cross-examination on all other subjects. Given the circumstance that Ramirez's and Tirri's refusal to answer questions was limited to a single subject, combined with the circumstance that they were impeached through other cross-examination questions, we cannot conclude that the trial court abused its discretion in refusing to strike their testimony. (See generally *ibid.* [finding no abuse of discretion in trial court's failure to strike testimony where a witness refused to answer questions regarding a single subject and the defendant received "the essence of what he needed for impeachment purposes" from the witness's answers to other questions].)

## IX. *Cumulative Error*

Ortiz and Miramontes both contend that cumulative error warrants reversal. In assessing a claim of cumulative error, the critical question is "whether defendant received due process and a fair trial." (*People v. Kronemyer* (1987) 189 Cal.App.3d 314, 349.) As discussed above, Ortiz and Miramontes have failed to show any errors in the trial court proceedings. As there were no errors that could have impacted their due process and fair trial rights, there was no cumulative error in this case.

## X. *Penal Code Section 654*

Ortiz and Miramontes contend that the trial court erred in refusing to stay their active gang participation sentences pursuant to Penal Code section 654. In support of this claim, they cite *People v. Mesa* (2012) 54 Cal.4th 191 (*Mesa*). As explained below, *Mesa* compels us to stay their active gang participation sentences.

Penal Code section 654 states, in relevant part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (Pen. Code, § 654, subd. (a).) "Whether multiple convictions are based upon a single act is determined by examining the facts of the case." (*Mesa, supra,* 54 Cal.4th at p. 196.)

39

Penal Code section 186.22, subdivision (a) states that any person "who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang" is guilty of the crime of active gang participation. Thus, an element of the crime of active gang participation is "willful promotion, furtherance, or assistance in felonious conduct by members of the gang." (*Mesa, supra,* 54 Cal.4th at p. 200.)

In *Mesa,* our Supreme Court held that when a defendant is convicted of active gang participation and a second offense, and the record shows that the second offense established the defendant's willful promotion, furtherance, or assistance of felonious conduct by members of the gang, Penal Code section 654 bars punishment on both offenses. (*Mesa, supra,* 54 Cal.4th at pp. 193, 197-198.) *Mesa* reasoned that Penal Code section 654 "applies where the 'defendant stands convicted of both (1) a crime that requires, as one of its elements, the intentional commission of an underlying offense, and (2) the underlying offense itself.' " (*Id.* at p. 198.)

Here, Ortiz was sentenced to concurrent prison terms for his active gang participation conviction and his conspiracy conviction. Based on our review of the record, we conclude that the sentence on the active gang participation conviction was barred by Penal Code section 654.[7] The trial court instructed the jury that it could convict Ortiz of active gang participation only if it found that "he either directly or actively committed or aided and abetted other members of that gang in committing the crime of Conspiracy to Sell Methamphetamine." During his closing argument, the

---

[7] We note that Penal Code section 654's bar on multiple punishment applies even though the prison terms were concurrent. " 'It has long been established that the imposition of concurrent sentences is precluded by [Penal Code] section 654 [citations] because the defendant is deemed to be subjected to the term of *both* sentences although they are served simultaneously.' " (*People v. Jones* (2012) 54 Cal.4th 350, 353, italics in original.)

prosecutor informed the jury that the active gang participation charge was based on Ortiz's involvement with the NF, and that it could convict Ortiz of active gang participation only if it found that Ortiz conspired to sell NF methamphetamine. Our review of the evidence confirms that Ortiz's participation in the charged methamphetamine conspiracy was the only evidence that established his willful promotion, furtherance, or assistance of felonious conduct by members of the NF. Accordingly, *Mesa* requires us to stay the sentence on Ortiz's active gang participation conviction.

Miramontes was sentenced to consecutive prison terms for his active gang participation conviction, his conspiracy conviction, his assault conviction, and his extortion conviction. Again, based on our review of the record, we conclude that the sentence on the active gang participation conviction was barred by Penal Code section 654. The trial court instructed the jury that it could convict Miramontes of active gang participation only if it found that "he either directly or actively committed or aided and abetted other members of that gang in committing the crimes of Conspiracy to sell Methamphetamine, . . . Assault with a Deadly Weapon . . . and Extortion." During his closing argument, the prosecutor informed the jury that the active gang participation charge was based on Miramontes's involvement with the NF, and that it could convict Miramontes of active gang participation only if it found that he "either directly or actively committed or aided and abetted other members of the gang in committing the crimes of conspiracy to sell methamphetamine, assault with a deadly weapon or extortion." Our review of the evidence affirms that Miramontes's participation in the charged conspiracy, assault, and extortion was the only evidence that established his willful promotion, furtherance, or assistance of felonious conduct by members of the NF. *Mesa* therefore requires us to stay the sentence on Miramontes's active gang participation conviction.

## XI. *Restitution Fine and Parole Revocation Restitution Fine*

Ortiz contends that because the sentence on his active gang participation conviction should have been stayed pursuant to Penal Code section 654, the trial court erred in considering the active gang participation conviction in calculating his restitution fine. He accordingly requests that we reduce his restitution fine to $2,800 and reduce the corresponding parole revocation restitution fine to $2,800. We conclude that the fines must be reduced.

The trial court ordered Ortiz to pay a restitution fine of $5,600. In setting the amount of the fine, the court announced that it was "using the formula under Penal Code section 1202.4, subsection (b)." Notes on the probation report show that the fine was calculated as "2 x 200 x 14." The court also imposed a corresponding parole revocation restitution fine of $5,600, which it ordered suspended.

Penal Code section 1202.4, subdivision (b) states that "where a person is convicted of a crime, the court shall impose a . . . restitution fine." The restitution fine "shall be set at the discretion of the court." (Pen. Code, § 1202.4, subd. (b)(1).) At the time the trial court imposed Ortiz's restitution fine, Penal Code section 1202.4, subdivision (b)(2) provided the following formula that could be used to calculate the restitution fine: "In setting a felony restitution fine, the court may determine the amount of the fine as the product of two hundred dollars ($200) multiplied by the number of years of imprisonment the defendant is ordered to serve, multiplied by the number of felony counts of which the defendant is convicted." (Former § 1202.4, subd. (b)(2), as adopted by Stats. 2010, ch. 351, § 9.)

"A restitution fine is punishment." (*People v. Kunitz* (2004) 122 Cal.App.4th 652, 656.) We have therefore held that "the [Penal Code] section 654 ban on multiple punishments is violated when the trial court considers a felony conviction for which the sentence should have been stayed pursuant to [Penal Code] section 654 as part of the court's calculation of the restitution fine under the formula provided by [Penal Code]

42

section 1202.4, subdivision (b)(2)." (*People v. Le* (2006) 136 Cal.App.4th 925, 934; see also *People v. Carlson* (2011) 200 Cal.App.4th 695, 711 [a conviction for which the sentence is stayed cannot serve as a multiplier in the Penal Code section 1202.4, subdivision (b)(2) formula].)

Here, the record shows that the trial court considered the active gang participation conviction in calculating Ortiz's restitution fine pursuant to Penal Code section 1202.4, subdivision (b)(2). Because the sentence on the active gang participation conviction should have been stayed pursuant to Penal Code section 654, the trial court erred in considering that conviction in calculating the restitution fine. We will modify the restitution fine utilizing a correct calculation under Penal Code section 1202.4, subdivision (b)(2). (See *People v. Le, supra,* 136 Cal.App.4th at pp. 935-936 [reducing the restitution fine, rather than remanding for recalculation of the fine, where the trial court misapplied Penal Code section 1202.4, subdivision (b)(2)].) When the active gang participation conviction is omitted from the calculation under Penal Code section 1202.4, subdivision (b)(2), the calculation results in a restitution fine of $2,800 (the product of $200 multiplied by the sentence of 14 years and then multiplied by one felony conviction). We therefore reduce the restitution fine to $2,800.

The reduction of the restitution fine necessitates reduction of the parole revocation restitution fine. Penal Code section 1202.45 states that "the court shall, at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional parole revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4." (Pen. Code, § 1202.45, subd. (a).) Under section 1202.45, a court "has *no* choice and *must* impose a parole revocation [restitution] fine equal to the restitution fine." (*People v. Smith* (2001) 24 Cal.4th 849, 853, italics in original.) Thus, because we reduce the restitution fine to $2,800, we must also reduce the parole revocation restitution fine to $2,800.

## DISPOSITION

The judgment is modified as follows: the sentence on Miramontes's Penal Code section 186.22, subdivision (a) conviction is stayed, the sentence on Ortiz's Penal Code section 186.22, subdivision (a) conviction is stayed, Ortiz's restitution fine is reduced to $2,800, and Ortiz's parole revocation restitution fine is reduced to $2,800. As so modified, the judgment is affirmed.

_____

RUSHING, P.J.

WE CONCUR:

_____

PREMO, J.

_____

ELIA, J.